Chancellor James
differing in opinion from his brethren, delivered the following decree :
As this is a case of considerable importance, and I have the misfortune to disagree with my brethren in the construction they have given to the will in question, I now beg leave to offer my reasons for dissenting from them.
In the 14th clause of the act for abolishing the rights of primogeniture, the words are, “that no lands or personal estate, which shall be acquired by any person after the making of bis or her will shall pass thereby, unless the said will be republished ; but every such person shall be considered as having died intestate, and the saína, shall he distributable according to the directions of this act.”
' In 1791, this act was passed; in 1805, the testator John Means, made his will, and afterwards acquired considerable personal property, but never republished his will. In 1808, the above cited clause of the act of 1791, was repealed : and in 1811, the testator John Means died. The will therefore was made and not republished during the time the above clause of the act of 1791, was offorce, and the testator’s widow, the complainant, claims a distributive share of the after acquired property, by virtue of said clause.
The question made for the Circuit Court was, whether the will came under the operation of the act of 1791, or the repealing clause of the act of 1808. I had no hesitation in deciding that it came under the act of 1791, which liad operation until it was repealed, and upon a careful revision of the case I contimie of the same-opinion.
*247 My brethren have decided, that the will was ambulatory, and had relation to, and effect only at testator’s death; and then that the act of 1808 had restored the common law, which must govern.
My intention now is, to examine into the merits of that decision. There had formerly been some doubts how the common law stood, as to personal property acquired after the making of a will; by1somc of the older authorities, it has been held “ that the construction is to he made as matters stood at the time of making the will so that after acquired property, not being in the contemplation of the testator at the time of making his will, could not pass thereby; but subsequent decisions appear to confine such construction down to specific things, then in possession of a testator, when his will was made, and which in their nature were not fluctuating.”
It is not material now to enquire into the merits of the different opinions respecting the common law on this subject 5 it is enough for us to know that doubts did exist} and that therefore it was necessary to clear them up. For this purpose, the clause of the act of 1791, lias always appeared to me to have been enacted. It docs not profess to repeal the common law, or any other law upon, the subject; it only declares what is hereafter to be considered as the law. All doubts about the matter were henceforth to be quieted, and the legislature enacts what was to be the rule in perpetuum rei testimonium. That the act was intended to declare the law, and not to repeal it, will be further seen when we come to consider what was the mischief then complained of, and the remedy proposed to cure it. The mischief was that the rights of primogeniture existed, and the estates of persons dying intestate were not equally distributable. To cure this evil, the legislature contemplated an equal division among the heirs. In cases of absolute intestacy, this was easily effected, by passing a law for that purpose. But they wished to extend their views farther. Where wills bad been lately made, fully expressive of the -interntion of the testator, and providing for all bis children, th«ugh unequally, thelaw makers could net well interfere; *248 but there were also cases of implied revocation, ami partial provision for children, concerning which the common lav; did not speak so plainly, as to settle all dispute, Such were, whether marriage alone, or the having a child alone, after the making of a will, was such a change of testator’s circumstances as would raise a presumption in law, that he intended to revoke his will. Such also was the present case, nearly allied to the above, where testator had made a will, kept it by him for a long time after the making thereof, had acquired property, had had children, and died without republishing his will. Here there appeared to bo room for legislative interference, because lie could not have had after acquired property in contemplation when he made his will, because though the rule of construction of the common law was pretty well settled, yet it was under many nice distinctions (understood not always by legal men) and even under such constructions, as have lately obtained, some of the children were often left unprovided for; and lastly, because it was not to be supposed that a testator would have left any of his children who liad not offended him, without provision.
Such must have been the reasoning of the framers of, this act, and such their grounds of interference. Now real estates acquired after making a will in favor of the heir, did not pass thereby $ the legislature too, by a clause, had already pat real and personal estate upon the same footing, as to distribution; and it was but to go ouc step further to place them on the same footing, as to intestacy. This promised to make the rule as to real and personal property uniform, to settle all former' doubts about the common law, and to cure the mischief of leaving children born after making the will unprovided for. But children were not the only sufferers.
In this country, much of the success, of the husband in acquiring property, depends upon the prudence and economy of the wife j but where, an in the present case, a will bad long been in the husband’s desk, and much property bad been afterwards acquired, it was to be expected, that unless the will was republished before his death, his widow would he left with a portion of his *249 estate, unequal to its extent, and her merits; and dispro-portioned to what the husband, would have left her himself, in case of republication 3 we see therefore that much mischief existed, both as to widows and children 3 and it was to this mischief that the legislature wished to apply a remedy. If in the latter instance of widows, the remedy has not operated quite so equally as they wished 3 still that is no good reason it should be forced to cease in its operation, before it was changed for a better by the same wise head that at first prescribed it. Thus it appears that the clause of the act 1791, above cited, was declaratory of, and did not repeal the common law, and that it was in its nature a remedial law.
Let us next examine whether the legislature have declared their intention in words that are plain and clear. No lands or personal estate which shall be acquired by any person after the making of Ids or her will shall pass thereby,” and so forth. The words, “ the making,” are formed from a present participle, and literally apply to the present, and not to the future time. In common parlance, when they are spoken of a will, they signify the signing, sealing, and publication of it. Another common meaning of these words is, the creation of a thing 5 in which sense, and I believe every other in the English language, they relate to the first existence, and not to the future operation 5 to the cause, not to theeffect. So much for the definition of the words used by the legislature, and when using them, to make themselves well understood, they would certainly apply them in the popular acceptation. All this is plain. How then can these words, speaking so clearly in presentí, be construed not to operate till in futuro. The act was passed, and the will was made while it was of force. But say the advocates for the construction assumed, the testator did not die til! after the act was repealed 3 the will did not have effect till after the death of the testator 3 and then the repealing law attached upon it, and must control it. But how the repealing law ? Because it revived the common law. I think I have shewn that the act of 1791, was only declaratory of the common law 3 but even admitting that itre- *250 pealed it, still it must opérate down to the time, when it was itself repealed, and governs the case. Then the only remaining argument is that the will did not have cf-feel till the death of the testator. But the position is only in part true. Among other instances that might be adduced, a will from the time of making it, fixes the specific property bequeathed, then in testator’s possession j it also frequently ascertains the objects of his bounty, and as a consequence thereof, leaves those unprovided for, who coming into life afterwards, are not named in the will.
Thus in the very instance contemplated by the legislature, and acted upon by them, a will would have effect from the time of making it, and not from the death of testator. - Then the will having effect, and the clause of the act of 1791 also having effect, the latter must govern.So that the intent of the law makers is evident, and the words expressive of it arc plain and clear. If not, let an attempt be made, in any form that may be proposed, to engraft words of the construction, which is advocated, upon the clause of the act of 1791, and the absurdity will be manifest. Yet if the legislature intended that their law should square with such a construction, it would be easy to engraft the latter, upon the stock of the former. But again, this is a remedial act, and it is the duty of the judges, so to construe the clause, as to suppress the mischief, and advance the remedy. We have seen what was the mischief, and what the remedy, and the complainant has been pointed at, as the object of the latter. Now the decree of the Circuit Court would have extended the remedy from the the time of passing the act, until its repeal; a period of about seventeen years; but by the con¡-¡traction given, a will made the day after passing the act of 17 91, may be brought under the operation of the act of 1808, which repeals it. This, besides taking from complainant her remedy, is lesening the number of cases greatly, to which it would otherwise have extended. All which is contrary to a well known construction of statute 3 aw.
*251 For the above reasons, I am of opinion, that the dc-ci’ce of the Circuit Court ought to have been sustained. *
(Signed) * W. D. Jambh.
Stark for complainant — Hooker and Blanding for defendant.
See 7th Bacon, 512, 313; Ambler, 401, 330; 2 Atk. 36, 377 3 Atk. 551; 1 Vez. 32, 225, 186.